UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

MICHELLE McNAIR,                                    Case No.

                     Plaintiff,                **COMPLAINT**

      -against-

                             **Jury Trial Demanded**

JEWISH BOARD OF FAMILY AND
CHILDREN'S SERVICES, INC., and CHANTAL
FRANK,

                  Defendants.
------------------------------------------------------------X

Plaintiff Michelle McNair ("McNair" or "Plaintiff") alleges against Defendants Jewish

Board of Family and Children's Services, Inc., ("Jewish Board") and Chantal Frank ("Frank")

(collectively, "Defendants") upon information and belief, as follows:

## NATURE OF THE CLAIMS

1. McNair complains pursuant to the American with Disabilities Act of 1990, as

amended, 42 U.S.C. §§ 12101 *et seq.*, ("ADAAA"), the New York State Human Rights Law, N.Y.

Exec. Law § 290, *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y. Admin.

Code § 8-101, *et seq.* ("NYCHRL"), seeking damages to redress the lost wages, emotional distress,

and other harms she suffered and continues to suffer as a result of being discriminated against and

subjected to a hostile work environment by her former employer on the basis of her **disability—**

**carpal tunnel syndrome** and retaliated against by her former employer after complaining of

discrimination.

2. The Federal, New York State, and New York City anti-discrimination and anti-

retaliation laws are intended to afford all employees the same rights, no matter if they are disabled,

and provide them with the dignity and respect they deserve in the workplace. As such, this is an

action for declaratory and monetary relief to redress Defendants' unlawful employment practices, including the unlawful discrimination and retaliation committed against Plaintiff.

## JURISDICTION AND VENUE

3.      This Court has original subject matter jurisdiction over Plaintiff's claims pursuant to the provisions of 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).  This Court has supplemental jurisdiction over Plaintiff's claims under city and state law pursuant to 28 U.S.C. § 1367(a), in that the city, state, and federal claims arise from a common nucleus of operative fact such that they are so related that they form part of the same case or controversy under Article III of the United States Constitution.

4.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), because the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

5.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## EXHAUSTION OF REMEDIES

6.      On or about March 28, 2022, Plaintiff duly filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was assigned Charge Number 520-2022-05333.

7.      On or about June 21, 2022, the EEOC terminated its processing of the Charge of Discrimination—making no determination on the merits of the Charge—and issued Plaintiff a Notice of Right to Sue.

8.    Plaintiff has exhausted her administrative remedies and files this complaint within 90 days of the EEOC's issuance of his Notice of Right to Sue, satisfying all procedural prerequisites for bringing this action.

## PARTIES

**Plaintiff Michelle McNair**

9.    At all times relevant to this action, McNair was and is a resident of Bronx County, New York.

10.    McNair is a 47-year-old woman with extensive qualifications and years of experience in the field of nursing.

11.    In or around November 2018, McNair commenced employment with Jewish Board as a Psychiatric Mental Health Nurse Practitioner.

12.    From the commencement of her employment with Jewish Board until March 2020, McNair reported to two facilities—the Harry Blumenfeld Counseling Center, located at 750 Astor Avenue, Second Floor, Bronx, New York 10467 (the "Blumenfeld Center") and The David and Lori Moore Family Riverdale Counseling Center (formerly, The J. W. Beatman Counseling Center) located at 521 West 239th Street, Bronx, New York 10463 (the "Riverdale Center").

13.    From March 2020 until the end of her employment with Jewish Board, due to the COVID-19 pandemic, McNair worked from home.

14.    In or around early-April 2021, McNair was diagnosed with chronic carpal tunnel syndrome in her right wrist.

15.    Since her initial diagnosis in or around early-April 2021, McNair has suffered and continues to suffer from chronic carpal tunnel syndrome in her right wrist.

16.     McNair's carpal tunnel syndrome was and is a physiological impairment affecting her musculoskeletal system, in which the median nerve in her right arm experiences increased pressure at the wrist.

17.     At all times relevant to this action, McNair's carpal tunnel syndrome has manifested by causing her extreme, radiating, chronic pain, swelling, and stiffness in her right wrist.

18.     At all times relevant to this action, the pain, stiffness, and discomfort McNair experiences as a result of her carpal tunnel syndrome are exacerbated by repetitive stress movements, such as continuous typing.

19.     The Mayo Clinic defines chronic conditions as those, "that persist over time and require consistent efforts to keep the disease from progressing or causing significant declines in quality of life."[1]

20.     At all times relevant to this action, McNair's carpal tunnel syndrome has substantially limited major life activities.

21.     For example, at all times relevant to this action, McNair's carpal tunnel syndrome severely restricts her ability to perform fine manipulation with her fingers, severely impairing her ability to type write for extended periods without pain and, thus, to communicate and to work.

22.     Additionally, at all times relevant to this action, McNair's carpal tunnel syndrome inhibits her from lifting objects.

23.     At all times relevant to this action, McNair required and continues to require medical treatment for her carpal tunnel syndrome, including taking prescribed pain medications twice daily, taking over-the-counter pain medication, wearing a wrist splint to bed every night, and receiving physical therapy.

---

[1] https://www.mayo.edu/research/centers-programs/robert-d-patricia-e-kern-center-science-health-care-delivery/about/glossary, retrieved July 23, 2022.

24.     For the duration of her employment with Jewish Board, McNair was a covered employee under all applicable statues.

**Defendant Jewish Board of Family and Children's Services, Inc.**

25.     At all times relevant to this action, Jewish Board was and is a domestic not-for-profit corporation duly organized and existing under and by virtue of the laws of the State of New York.

26.     At all times relevant to this action, Jewish Board was and is a domestic not-for-profit entity authorized to operate in the State of New York.

27.     At all times relevant to this action, Jewish Board maintains its principal office at the premises designated and/or more commonly known as 135 West 50th Street, 6th Floor, New York, New York 10020.

28.     At all times relevant to this action, Jewish Board was and is a health and human services agency providing mental health, housing, and social services to vulnerable populations within New York City.

29.     At all times relevant to this action, Jewish Board runs/operates the Blumenfeld Center and Riverdale Center facilities at and for which McNair worked during her employment with Jewish Board.

30.     For the duration of McNair's employment with Jewish Board, Jewish Board employed fifteen (15) or more employees.

31.     At all times relevant to this action, Jewish Board was a covered entity within the meaning of all applicable statutes.

32.     At all times relevant to this action, Jewish Board was an employer of McNair within the meaning of all applicable statutes.

**Defendant Chantal Frank**

33.     Upon information and belief, at all times relevant to this action, Frank was and is a resident of the State of New York.

34.     At all times relevant to this action, Frank was employed by Jewish Board as the Senior Director of Total Rewards.

35.     In her capacity as Senior Director of Total Rewards for Jewish Board, Frank possessed and exercised authority, vested in her by Jewish Board, over the terms and conditions of McNair's employment, including, but not limited to the authority to review and approve or deny requests for accommodation, engage in the collaborative process, approve or deny requests for leave under FMLA and/or disability benefits, set, modify, and/or enforce Jewish Board's policies on discrimination, requests for reasonable accommodations, and retaliation, and recommend and/or otherwise participate in the determination to change McNair's employment status with Jewish Board.

36.     Upon information and belief, Frank is currently employed by Jewish Board.

## FACTUAL ALLEGATIONS

37.     In or around November 2018, McNair commenced employment with Jewish Board.

38.     For the duration of her employment with Jewish Board, McNair held the position of Psychiatric Mental Health Nurse Practitioner.

39.     At all times relevant to this action, McNair was qualified for the position of Psychiatric Mental Health Nurse Practitioner.

40.     Prior to commencing employment with Jewish Board, McNair earned the following degrees: a B.A. in Psychology, a BSN (Bachelor of Science in Nursing), an M.A. in Psychology, and an MSN (Master of Science in Nursing).

41.     Prior to commencing employment with Jewish Board, McNair worked in the field of health care and/or nursing in various capacities since 2005, with her employment interrupted only to obtain the aforementioned degrees.

42.     During and after her employment with Jewish Board, McNair held and continues to hold active licenses as a Registered Nurse (since 2008) and as a Psychiatric Mental Health Nurse Practitioner (since 2018), becoming Board Certified in 2019.  She also possesses a license issued by the DEA to prescribe controlled substances (since 2018).

43.     During her employment with Jewish Board, McNair reported to the Blumenfeld Center and the Riverdale Center for work, until she began working from home in March 2020.

44.     While employed at Jewish Board, McNair earned approximately $135,000 per year in base salary, an annual bonus of approximately $1,200, medical, dental, and vision insurance benefits and a pension.

45.     Additionally, McNair's position at Jewish Board qualified her for significant assistance (and ultimately, forgiveness) of her student loans.

46.     In her capacity as a Psychiatric Mental Health Nurse Practitioner for Jewish Board, McNair's duties and responsibilities included, but were not limited to assessing, diagnosing, and treating (including prescribing medication for) adults and children with mental health and developmental concerns.

47.     In connection with performing her duties and responsibilities, a significant portion of McNair's regular workday included typing and entering patient information and notes.

48.     Prior to experiencing right wrist pain leading to her diagnosis of carpal tunnel syndrome, McNair was able to type and enter patient information and notes with no required accommodation.

49.     For the duration of her employment with Jewish Board, when she was able and allowed to perform work for Jewish Board, McNair satisfactorily performed her duties and responsibilities.

50.     For the duration of her employment with Jewish Board, when she was able and allowed to perform work for Jewish Board, McNair was able to—and did—perform all of the essential functions of her job.

51.     When she was able and allowed to perform work for Jewish Board, McNair's work performance was excellent; she never received discipline—or even a write-up or warning—and she was highly regarded by her patients, supervisors, and coworkers.

52.     Despite McNair's exceptional performance, Jewish Board subjected McNair to discrimination, a hostile work environment, and failed to accommodate McNair with respect to her disability—chronic carpal tunnel syndrome in her right wrist.

53.     On or around March 30, 2021, McNair was unable to unable to work due to excruciating pain in her right wrist.

54.     McNair promptly went to the office of her primary care physician—Dr. Kenneth Nyer ("Dr. Nyer")—for an emergency visit due to her wrist pain.

55.     Dr. Nyer's office referred McNair to an orthopedist—Dr. Michael Murray ("Dr. Murray") for her wrist pain.

56.     In or around early-April 2021, McNair saw Dr. Murray for her wrist pain.

57.     During that visit, Dr. Murray diagnosed McNair with chronic carpal tunnel syndrome—a recurring condition exacerbated by repetitive stress motions, such as typing.

58.     Throughout April and May, McNair continued to experience extreme pain in her right wrist and was unable to work.

59.     On May 27, 2021, Dr. Murray cleared McNair to return to work on June 14, 2021, with the following accommodation, memorialized in a note from Dr. Murray stating, **"She will need to not type and use a voice recorder if possible no repetitive use of wrists [sic]"**.

60.     On or around June 3, 2021, McNair emailed Dr. Murray's May 27, 2021, note to her then-direct supervisor—Jewish Board Clinical Director Jacques Nir ("Nir")—Nir's then-supervisor, Karen Cwalinski ("Cwalinski"), and Office Manager Laissa Perez.

61.     Additionally, on or around June 3, 2021, Dr. Murray completed and faxed to Jewish Board's third-party administrator, The Hartford, a document entitled "Attending Physician's Statement – Progress Report".

62.     The "Attending Physician's Statement – Progress Report" Dr. Murray faxed to The Hartford indicated McNair's carpal tunnel syndrome diagnosis and stated, *inter alia*, that McNair could not perform work involving "fine manipulation (fingering, keyboard)" for an "unknown" duration.

63.     Between June 4 and June 9, 2021, Nir called McNair to discuss her email.

64.     During their call, Nir advised McNair that Jewish Board would provide her with an accommodation based upon the note from Dr. Murray.

65.     Nir further told McNair that he would speak with Jewish Board's IT department to provide her with a compatible voice-to-text program in advance of her return to work.

66.     Neither Nir—nor anyone at Jewish Board—required McNair to submit further documentation to The Hartford to grant her accommodation request, nor did anyone suggest McNair's requested accommodation would not or could not be granted.

67. On June 10, 2021—four days before the date by which Dr. Murray's letter cleared McNair to return to work, with accommodation, from her carpal tunnel syndrome diagnosis— McNair was forced to undergo a total knee replacement for her left knee.

68. McNair's knee condition was completely unrelated to her carpal tunnel syndrome.

69. After a successful surgery, on August 23, 2021, McNair received a note from her knee doctor—Dr. Ran Schwarzkopf ("Dr. Schwarzkopf")—which stated:

> **Michelle McNair is under my care for treatment of her left knee.** She has underwent left total knee replacement on 6/10/2021 at NYU Langone Orthopedic Hospital.
>
> **From our medical standpoint**, she may return to work without restrictions starting Monday, September 13, 2021.
>
> **Emphasis added.**

70. On August 24, 2021, McNair emailed Frank the above-referenced note from Dr. Schwarzkopf clearing her to return to work from her knee surgery.[2]

71. As McNair was cleared to return with accommodation from her carpal tunnel syndrome on June 14, 2021, and her knee surgery had no effect on her carpal tunnel syndrome or any required accommodation arising from her carpal tunnel syndrome, McNair was able—and cleared by Dr. Schwarzkopf—to return to work on September 13, 2021, with the accommodation for her carpal tunnel syndrome described in Dr. Murray's May 27, 2021, letter.

72. Because, in advance of her original June 14, 2021, clearance date, McNair advised Jewish Board and of her accommodation requirement and request for a voice-to-text program and Nir promised McNair she would receive her requested accommodation, McNair had no reason to believe her unrelated knee surgery would interfere with the promised accommodation for her carpal tunnel syndrome.

---

[2] Upon information and belief, while McNair was on leave due to her knee surgery, Jewish Board terminated Nir and Cwalinski for unrelated reasons.

73.     On September 9, 2021, in advance of her expected return to work, McNair spoke with Eileen Verity ("Verity"), Acting Clinic Director, regarding Jewish Board's plan to accommodate McNair upon her return to work.

74.     Verity informed McNair that the Verbatim voice-to-text program—one of many voice-to-text programs available for purchase—could not be configured to work with myAvatar—Jewish Board's Electronic Health Record ("EHR") program.

75.     That same day, McNair emailed Frank to express her concerns about her conversation with Verity and how Jewish Board could accommodate her carpal tunnel syndrome.

76.     Frank did not respond to McNair's September 9, 2021, email.

77.     With no indication that Jewish Board was taking any action towards accommodating McNair's carpal tunnel syndrome, on September 10, 2021, McNair took it upon herself to find a voice-to-text program compatible with myAvatar.

78.     On September 10, 2021, McNair called myAvatar, and myAvatar advised McNair that the 3M M*Modal voice recognition software program was compatible with myAvatar.

79.     On September 13, 2021—the day she was cleared to return by Dr. Schwarzkopf, needing only the accommodation provided for by Dr. Murray—McNair emailed Frank and Michelle Latimer ("Latimer"), Director of Psychiatric Practice.

80.     In her email, McNair reminded Frank and Latimer that her return to work was contingent upon receiving the voice recognition program accommodation (or some other accommodation to avoid the repetitive stress motion of typing), again attached Dr. Murray's May 27, 2021 note, referenced having sent Jewish Board Dr. Murray's note on June 3, 2021, advised Frank and Latimer that she called myAvatar and was told that the 3M M*Modal voice recognition software program was readily available and compatible with myAvatar, and reiterated she was

fully able to return to work and perform all of her job duties with only this (or any other non-typing) accommodation.

81.   Neither Frank nor Latimer responded to McNair's September 13, 2021, email.

82.   On September 30, 2021, Frank emailed McNair requesting McNair fill out a note from her doctor regarding her accommodation request and complete attached paperwork. However, no documents were attached to Frank's email.

83.   When McNair responded that Frank had not attached any documents to her email, on October 1, 2021, Frank resent the email with the attached paperwork for Dr. Murray to complete.

84.   On October 6, 2021, McNair saw Dr. Murray, who completed the paperwork Frank attached to the October 1, 2021 email.

85.   The next day—October 7, 2021—McNair emailed the completed reasonable accommodation request to Frank and Latimer.

86.   On October 11, 2021, Frank emailed McNair acknowledging receipt of the completed reasonable accommodation request paperwork, indicating she would forward the paperwork to The Hartford, and advising McNair that Jewish Board and The Hartford would jointly review her request.

87.   On October 20, 2021, McNair emailed Frank and Latimer requesting a status update as to her accommodation request and inquiring as to why The Hartford needed to be involved in the review of her accommodation request, as she was looking to return to work full-time and had already been cleared for the accommodation by Nir without review from The Hartford.

88.   Neither Frank nor Latimer responded to McNair's October 20, 2021 email.

89.     On October 26, 2021, McNair spoke with The Hartford and was advised The Hartford had not received McNair's paperwork for her reasonable accommodation request, despite McNair having submitted it to Frank and Latimer on October 7, 2021.

90.     That day, McNair herself forwarded her accommodation request paperwork to The Hartford, and The Hartford acknowledged receipt of her request.

91.     On October 27, 2021, McNair emailed Frank and Latimer requesting another status update as to her accommodation request and indicating she had not received a return to work date—or compensation—from Jewish Board or The Hartford.  In that email, McNair also advised Frank and Latimer that she had not received confirmation from Jewish Board that her accommodation request was under review and in fact, The Hartford stated they did not receive any accommodation request from Frank on behalf of McNair.

92.     Neither Frank nor Latimer responded to McNair's October 27, 2021, email.

93.     On November 10, 2021, McNair emailed Latimer stating that she wrote several prior emails to Jewish Board regarding her accommodation request, with no response.  McNair requested confirmation of her continued employment and that her position was still available for her to return to.  Latimer replied, apologizing for the lack of response and indicating that McNair's position and hours remained open and available.

94.     On November 11, 2021, Frank emailed McNair, copying Judy Archer ("Archer"), Jewish Board's Chief People Officer, to advise McNair that Jewish Board was reviewing her accommodation request.

95.     Frank's email acknowledged receiving McNair's accommodation request on October 7, 2021—however, McNair (through her email of Dr. Murray's letter) initially requested the accommodation on June 3, 2021.

96.     Over the next several days, McNair exchanged emails with Frank, Latimer, and Jessica Hallmark ("Hallmark") regarding McNair being locked out of Dayforce—the Jewish Board employee health insurance portal.  Ultimately, McNair's access to Dayforce was restored.

97.     On December 3, 2021—six months after her initial request for an accommodation and nearly three months after she was cleared to return to work with the accommodation—Frank emailed McNair informing her that **Jewish Board denied her request for an accommodation**.

98.     Frank's email to McNair explaining Jewish Board's decision contained several false statements, including:

a.  Frank's email opened with, "The Jewish Board is committed to engaging in a cooperative dialogue with an individual who has requested a reasonable workplace accommodation."  This assertion is false, as during the six month period between McNair's initial request for an accommodation and Jewish Board's denial, Jewish Board did not once meet with McNair to discuss how her disability could be accommodated.  After Nir granted McNair's request for an accommodation, Jewish Board did not notify McNair that they would be reneging on Nir's promise to provide McNair with the voice-to-text accommodation.  McNair was required to (and did) repeatedly provide and forward medical documentation regarding her disability and requested accommodation, which was either ignored or lost by Jewish Board and/or its administrators.  Despite McNair independently researching voice-to-text programs and confirming the compatibility of the program with Jewish Board's myAvatar operating system, Jewish Board did not discuss the 3M M*Modal program with McNair.  Furthermore, prior to this email, not once did Jewish Board speak with McNair to explore an alternative accommodation

allowing her to return to work if, despite all indications otherwise, implementation of a voice-to-text program was not feasible.  In fact, Jewish Board frequently went weeks without responding to McNair's status requests and failed to communicate McNair's accommodation request paperwork to The Hartford.

b. In the above-referenced email from Frank to McNair, Frank further falsely stated, "You requested this ADA Reasonable Accommodation after being cleared by Dr. Ran Schwazkopf [sic] to return to work without restrictions on September 13, 2021 from your FMLA/Disability leave of absence which began on March 30, 2021." McNair initially requested the reasonable accommodation on June 3, 2021—prior to her knee surgery and thus, well before she provided Jewish Board the clearance note from Dr. Schwarzkopf.  Also, as expressly stated in Dr. Schwarzkopf's note, Dr. Schwarzkopf cleared McNair to return to work without restriction **from her knee replacement surgery**.  McNair attempted to eliminate any possible misunderstanding by Frank and Jewish Board as to the scope of Dr. Schwarzkopf's note first by repeatedly explaining the discrete nature of her carpal tunnel syndrome requiring accommodation and her resolved knee condition, then by the documents she and Dr. Murray submitted in October 2021.  Particularly in light of McNair's and Dr. Murray's clarifying explanations and documentation, Frank's (and Jewish Board's) continued reliance on Dr. Schwarzkopf's note to insist McNair could return to work without accommodation for her carpal tunnel syndrome was unreasonable.

c. Frank's third false statement in her email to McNair reads, "After multiple discussions within the Agency, it has been determined that we are unable to

accommodate your request for transcription services for our Avatar system.  It is also our understanding that you were part of some of these discussions earlier this year."   The only communication McNair received from Jewish Board about "transcription services" was when Verity told McNair that the Verbatim program was not compatible with myAvatar.  Jewish Board did not discuss with McNair the subsequent conversation McNair had with myAvatar (which she relayed to Jewish Board) confirming the compatibility of the 3M M*Modal voice recognition software program, nor did Jewish Board discuss with McNair any other possible mechanism or method to accommodate McNair's need to refrain from the repetitive stress motions of typing.

d.   Frank's further falsely stated, "As a Nurse Practitioner, typing and writing are an essential function [sic] of the role in order to maintain patient records and for billing of services."   Regardless of their essentiality to the Nurse Practitioner role, maintaining patient records and billing of services do not require typing or writing.  This is the essence of the accommodation McNair had been requesting for the previous six months.

99.   Frank concluded her email to McNair by stating, **"If you are not able to return to full duty at this time, your employment will separate…"**

100.   McNair was outraged and immensely frustrated by Jewish Board's decision to deny her accommodation request and the misstatements and errors Frank's email indicated Jewish Board relied upon to reach their decision to deny her the requested accommodation.

101.   On December 7, 2021, McNair emailed a response to Frank, refuting the notion that Jewish Board engaged in the collaborative process in any meaningful capacity, once again

explaining Dr. Murray's letter and Nir's approval of the requested accommodation in June, repeating her interest in remaining an employee of Jewish Board, and requesting information as to how to appeal the denial of her accommodation request.

102.    On December 9, 2021, Hallmark sent McNair an email with a Zoom invitation for later that evening.

103.    That evening, McNair joined a Zoom call with Frank and Rand Palmer ("Palmer"), Director of Employee Labor Relations.

104.    As McNair later learned, the purpose of the call appeared to be simply to reiterate Jewish Board's denial of McNair's accommodation request and to ask if McNair had any new information to provide regarding her request.

105.    During the call, both Frank and Palmer were extremely evasive and refused to answer basic questions from McNair, such as what her employment status was, what type of new information would cause Jewish Board to reevaluate their denial of her accommodation, whether there was an appeals process, and whether Jewish Board had any blind employees.

106.    Palmer did state during the Zoom meeting that myAvatar "can't allow you to take notes through diction [sic]".

107.    McNair replied to Palmer's assertion that myAvatar did not allow for notes to be taken through dictation, by telling Palmer that she spoke with the company that makes the myAvatar program and they advised her the 3M M*Modal voice recognition software program was compatible.

108.    Palmer then stated, **"…you have to understand that all of us have limited contracts and don't necessarily subscribe to everything that they may, as a corporation, provide."**

109.    After McNair conveyed to Palmer that myAvatar directly contradicted Palmer's first explanation for why Jewish Board denied her request for a voice-to-text program, Palmer's pivot to Jewish Board's purported contractual limitations served as an acknowledgment that Jewish Board's failure to provide McNair with a voice-to-text program was not an issue of capability, but of Jewish Board's willingness to purchase the dictation software.[3]

110.    As of June 30, 2021, Jewish Board's **net** assets totaled $129,880,842.[4]

111.    When Frank told McNair she would have to separate from employment if she could not perform her job without accommodation and recommended she look into long-term disability, McNair again complained that it was discriminatory for Jewish Board to require her to be cleared without need for accommodation, and she reiterated her ability to perform all the functions of her job if she was given an accommodation allowing her to avoid the repetitive stress motions of typing.

112.    Palmer interrupted McNair and told her they were not going to argue over the merits of McNair's accommodation request, that Jewish Board had made its decision regarding her request, and there was nothing to discuss if she did not have any new information to provide.

113.    At 8:04 p.m. on December 21, 2021, Frank sent McNair an email advising her that if, by December 28, 2021, she did not provide new medical information or return to work (without accommodation), Jewish Board would terminate her employment.

---

[3] A Google search for "M*Modal voice-to-text cost" returns the following link as the second non-advertisement result: https://www.americandictation.com/shop/speech-recognition/medical-legal-professional/mmodal-medical-speech-recognition-bundle/ (retrieved January 3, 2022).  The referenced link is a website offering the M*Modal Fluency Direct for Practices medical speech recognition bundle for sale.  As reflected in the linked website, the program is compatible with NetSmart myAvatar (Jewish Board's EHR platform) and is offered for sale for $1,629.99, which includes the hardware, software, and a three year use license.  The process for searching for and retrieving the above website and reviewing the aforementioned information took less than one minute.

[4] https://jewishboard.org/wp-content/uploads/2021/11/jb_audit_2021.pdf (retrieved July 26, 2022)

114.    At 6:36 a.m. on December 23, 2021, McNair replied to Frank's email with a lengthy email expressing her confusion, dismay, and distress at Jewish Board's continued refusal to accommodate her.

115.    In this email, McNair once again summarized her relevant medical history, again identified the source of confusion regarding the note from her knee doctor (purportedly serving as the basis for the denial of her accommodation request) and the note from her wrist doctor, and again explained her efforts to locate a voice-to-text program compatible with Jewish Board's myAvatar operating system.

116.    McNair, in this email, complained of Frank's discriminatory and retaliatory refusal to provide the voice-to-text program—resulting in her being without **any** income since September 24, 2021—and Frank's threat to terminate her employment.  Concluding the email, McNair said:

> **"As I asked you during our Zoom meeting, does Jewish Board have any blind employees? Would Jewish Board refuse to hire a blind employee because they could not do the job without a voice-to-text program?"**

117.    On December 29, 2021—one day after McNair was to be terminated, per Frank's email—Frank emailed McNair to advise her that the voice-to-text system she identified was not compatible with MyAvatar, but that Jewish Board **"…[is] looking into other alternatives."**

118.    At all times relevant to this action, voice-to-text programs, such as the M*Modal bundle, are routinely used by—and directly marketed to—health care providers and are designed to be compatible with a variety of EHR platforms, including myAvatar.

119.    At all times relevant to this action, health care providers—including those without the need to use voice-to-text programs as an accommodation—routinely use voice-to-text programs as an alternative to typing to complete charting and note taking.

120.    Defendants first began looking for a compliant voice-to-text program for McNair nearly seven (7) months after she first requested the accommodation.

121.    Defendants did not make any effort to explore methods by which to accommodate McNair's carpal tunnel syndrome until December 29, 2021, and only after McNair repeatedly complained of discrimination and retaliation.

122.    From June 3, 2021, through the end of McNair's employment with Jewish Board, Defendants never offered McNair use of a voice-to-text program to accommodate her carpal tunnel syndrome.

123.    Between June 3, 2021, and at least January 5, 2022, Defendants did not engage in the interactive process with McNair to explore potential reasonable accommodations for her carpal tunnel syndrome.

124.    From September 13, 2021, through the end of McNair's employment with Jewish Board, Jewish Board did not offer McNair any accommodation which would allow her to return to work with her full salary.

125.    Between September 13, 2021, and February 15, 2022, Jewish Board did not offer McNair any process by which she could potentially receive an accommodation.

126.    Although McNair was cleared to return to work with accommodation on September 13, 2021, from then until the end of McNair's employment with Jewish Board, Jewish Board did not pay McNair her salary.

127.    Between September 13, 2021, and the end of her employment with Jewish Board the only income McNair received related to her employment with Jewish Board was disability pay—a reduction from her full salary—between the date she was cleared to return to work from

her knee surgery (September 13, 2021) and when her disability benefits expired, on or about September 24, 2021.

128.   After her disability benefits expired on or about September 24, 2021, and continuing until the end of her employment with Jewish Board, McNair did not receive any income from Jewish Board.

129.   On January 5, 2022, counsel for McNair emailed to Jewish Board's General Counsel a Demand Letter alleging, in sum and substance, the discriminatory, hostile, and retaliatory conduct to which Defendants subjected McNair, providing a detailed recitation of the factual and legal basis of the claims accrued to date, and advising Defendants of McNair's intent to sue.

130.   Later that day, counsel for Jewish Board acknowledged receipt of the email with McNair's Demand Letter.

131.   By letter dated February 16, 2022, Frank advised McNair that Jewish Board was offering her an "ergonomic assessment at [McNair's] home", to determine what, if any, ergonomic accommodation Jewish Board would consider offering McNair.

132.   Frank's letter indicated that McNair should schedule a time within the subsequent two (2) weeks for representatives from Jewish Board to inspect McNair's home.

133.   In the aforementioned letter, Frank estimated that, **"any ergonomic accommodation could take at least 1-2 months to fully process,"** during which time McNair would remain on **"unpaid leave"**.

134.   The "ergonomic assessment" offered in Frank's letter was the first time Jewish Board took any concrete steps to potentially accommodate McNair.

135.   Frank's letter was not an offer to provide a reasonable accommodation to McNair, but rather, constituted an offer to, in a minimum of 1-2 months, for which McNair would not be paid and subject to Jewish Board's inspection of McNair's home, potentially provide McNair some accommodation of unknown efficacy.

136.   Jewish Board had no legitimate reason for failing to offer McNair the option of an "ergonomic assessment" at any point after she initially requested an accommodation.

137.   According to the estimated time frame that Jewish Board required to process an "ergonomic accommodation" for McNair—as set forth in Frank's letter—had Jewish Board offered McNair an "ergonomic assessment" of her home which she accepted and scheduled on or before July 13, 2021, Jewish Board would have been able to provide McNair any "ergonomic accommodation" before September 13, 2021—the date McNair was cleared to return to work with accommodation.

138.   Had Jewish Board provided McNair an "ergonomic accommodation" prior to her September 13, 2021, return-to-work date, McNair would not have required to take any further "unpaid leave" to receive her accommodation.

139.   In offering McNair an "ergonomic assessment"—which required an inspection of McNair's home by Jewish Board's representatives or agents to determine what accommodation, if any to provide McNair—Defendants eschewed significantly less invasive options, including providing McNair a voice-to-text program or a scribe to reasonably accommodate her carpal tunnel syndrome.

140.   Particularly in light of the gaslighting, false statements, and false representations made by Frank, Palmer, and other Jewish Board employees and agents, McNair did not feel

comfortable allowing Jewish Board or its agents to perform an "ergonomic assessment" of her home.

141.    Additionally, given Defendants' actions since McNair first requested a reasonable accommodation, McNair had no confidence that, at the end of the unpaid "ergonomic assessment" and accommodation processing period, any "ergonomic accommodation" offered by Jewish Board would reasonably accommodate her carpal tunnel syndrome.

142.    Further, by remaining on an "unpaid leave" in which she was not performing any clinical work, McNair was at risk of not meeting minimum requirements necessary to maintain her eligibility for her student loan forgiveness program and accreditation of her professional licenses.

143.    As another result of Defendants' non-payment of McNair's wages and reason why McNair was unable to accept the unpaid, uncertain time-frame in which Jewish Board would have completed its processing of the "ergonomic accommodation", McNair continued to suffer financial consequences, and would have fallen behind on her privately-held student loans.

144.    Through her counsel, McNair advised outside counsel for Jewish Board that she was not comfortable with the offered "ergonomic assessment".

145.    Defendants were not willing to—and did not—offer McNair any option for accommodation other than the "ergonomic assessment".

146.    With no mechanism for returning from her indefinite, involuntary, unpaid "leave", on or around April 13, 2022, McNair had no choice but to accept her constructive/effective termination from Jewish Board.

147.    By letter from Archer, dated April 21, 2022, McNair was advised that her employment with Jewish Board was terminated, effective April 30, 2022.

148.    After September 13, 2021, with a reasonable accommodation allowing her to avoid the repetitive stress motions of typing, McNair was able to perform all the essential functions of the Psychiatric Mental Health Nurse Practitioner position at Jewish Board.

149.    From September 13, 2021, until the end of her employment with Jewish Board, despite McNair's ability to return to work with a reasonable accommodation, Defendants failed to provide McNair with a reasonable accommodation, preventing McNair from returning to work.

150.    After her employment with Jewish Board ended, McNair subsequently obtained employment at another health care provider located in New York, as a Psychiatric Mental Health Nurse Practitioner, performing substantially the same duties and responsibilities as she did for Defendants, including charting and note taking.

151.    Prior to commencing employment with her subsequent employer, McNair requested and received a voice-to-text accommodation for her carpal tunnel syndrome, enabling her to avoid nearly all typing.

152.    As a result of receiving the voice-to-text accommodation from her subsequent employer, McNair was and is able to perform all the functions of her job with only a very limited amount of typing, primarily to correct any errors in the voice-to-text translation.

153.    The limited amount of typing involved with her use of the voice-to-text program allows McNair to avoid the repetitive stress motions of regular typing and enables McNair to perform her job duties.

154.    At all times relevant to this action, Jewish Board was able to provide a reasonable accommodation for McNair's carpal tunnel syndrome without any undue hardship to the operation of Jewish Board's business.

155.    McNair's request for a voice-to-text program or other accommodation allowing her to avoid nearly all typing was reasonable.

156.    Despite Jewish Board's awareness of McNair's carpal tunnel syndrome and ability to accommodate McNair, Jewish Board refused to provide her with a reasonable accommodation for her carpal tunnel syndrome.

157.    Defendants discriminated against McNair on the basis of her disability—her carpal tunnel syndrome.

158.    Defendants subjected McNair to a discriminatory hostile work environment on the basis of her disability—her carpal tunnel syndrome.

159.    After and as a result of McNair's complaints of Defendants' unlawful discriminatory conduct, Defendants retaliated against McNair.

160.    As a result of the discrimination and hostile work environment to which McNair was subjected by Defendants—including Defendants' failure to pay McNair an income—McNair's work environment was intolerable.

161.    Defendants' discriminatory conduct created a hostile work environment for McNair which no reasonable person could be expected to tolerate.

162.    During her employment with Defendants, McNair complained to Defendants of their unlawful discriminatory conduct.

163.    After and because she complained of the discriminatory conduct to which she was subjected, Defendants retaliated against McNair.

164.    Defendants discriminated against McNair by refusing to accommodate her disability, failing to engage in the interactive process, failing to pay her income, and ultimately,

forcing McNair to accept her constructive/effective termination (and, had she not been forced to accept her constructive/effective termination, terminating her employment) from Jewish Board.

165.    Defendants retaliated against McNair after and as a result of her complaints of and opposition to Defendants' discrimination by continuing to refuse to accommodate her disability and engage in the interactive process, fostering an increasingly hostile work environment in response to her repeated requests for accommodation and to engage in the interactive process, continuing to refuse to pay McNair any income, and ultimately, forcing McNair to accept her constructive/effective termination (and, had she not been forced to accept her constructive/effective termination, terminating her employment) from Jewish Board.

166.    Frank, by repeatedly ignoring, and then denying, McNair's repeated requests for accommodation and failing to engage in the interactive process, aided and abetted in the discriminatory conduct to which McNair was subjected.

167.    Frank, by continuing to refuse to accommodate McNair or engage in the interactive process, by creating and fostering an increasingly hostile work environment, and by continuing to prevent McNair's from returning to work and earning an income, ultimately forcing her to accept her constructive/effective/actual termination after and because of McNair's complaints of Defendants' discriminatory conduct, aided and abetted in the retaliatory conduct to which McNair was subjected.

168.    Defendants' actions and conduct were and are intentional and intended to harm McNair.

169.    Defendants have caused damage and injury to McNair by first failing to accommodate McNair and subjecting her to discrimination and a hostile work environment and

then again by retaliating against her after and because she complained of Defendants' unlawful discriminatory conduct.

170.    McNair has been unlawfully discriminated against, was humiliated, and has been degraded and belittled; and as a result, she suffered and continues to suffer a loss of rights, emotional distress, loss of income, and earnings.

171.    As a result of Defendants' discriminatory and retaliatory treatment, McNair suffered and continues to suffer severe emotional distress.

172.    As a result of the acts and conduct complained of herein, McNair has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits, and other compensation which such employment entails, and McNair has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

173.    As Defendants' conduct has been willful, reckless, outrageous, intentional, and/or malicious, Defendants are liable to McNair for punitive damages.

## FIRST CAUSE OF ACTION
### Failure to Provide a Reasonable Accommodation in Violation of the ADAAA
### (As to Defendant Jewish Board only)

174.    Plaintiff McNair repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

175.    The ADAAA, 42 U.S.C § 12112(b)(5)(A) requires employers to provide:

> reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

176.    Jewish Board is a covered entity subject to the provisions of this statute.

177.   McNair was a qualified Psychiatric Mental Health Nurse Practitioner employed by Jewish Board.

178.   As of June 3, 2021, Defendants were aware of McNair's carpal tunnel syndrome—a qualifying disability.

179.   As of September 13, 2021, McNair was able to perform the essential functions of her job at Jewish Board with an accommodation—such as a voice-to-text program or scribe service—allowing her to avoid nearly all typing.

180.   Providing McNair with a voice-to-text program, scribe service, or other accommodation allowing her to return to work as long as she could avoid most typing would not impose an undue hardship on Jewish Board's business operations.

181.   Defendants refused to accommodate McNair's carpal tunnel syndrome by, among other reasons set forth herein, repeatedly denying her requests for a voice-to-text program, failing to engage in the interactive process, and failing to offer any other reasonable accommodation allowing McNair to return to work with limited typing.

182.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, McNair has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

### SECOND CAUSE OF ACTION
### Discrimination in Violation of the ADAAA
### (As to Defendant Jewish Board only)

183.   Plaintiff McNair repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

184.   The American with Disabilities Act, as amended, 42 U.S.C § 12112(a) provides:

No covered entity shall discriminate against a qualified individual on the basis of disability in regard to… discharge of employees… and other terms, conditions and privileges of employment.

185.   Jewish Board is a covered entity subject to the provisions of this statute.

186.   McNair was a qualified Psychiatric Mental Health Nurse Practitioner employed by Jewish Board.

187.   Defendants discriminated against McNair on the basis of her disability—her carpal tunnel syndrome—by, among other reasons set forth herein, forcing McNair to remain on an "unpaid leave" despite her ability to perform the essential functions of her job with a reasonable accommodation, subjecting her to a discriminatory hostile work environment, and ultimately, forcing McNair to accept her constructive/effective termination (reinforced by Defendants affirmatively terminating her employment).

188.   As a direct and proximate result of Defendants' unlawful discriminatory conduct, McNair has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

### THIRD CAUSE OF ACTION
### Hostile Work Environment in Violation of the ADAAA
### (As to Defendant Jewish Board only)

189.   Plaintiff McNair repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

190.   By the actions described above, among others, Defendants have discriminated against McNair and subjected McNair to a hostile work environment because of her carpal tunnel syndrome—a disability—in violation of the ADAAA.

191.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, McNair has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## FOURTH CAUSE OF ACTION
### Retaliation in Violation of the ADAAA
### (As to Defendant Jewish Board only)

192.    Plaintiff McNair repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

193.    By the actions described above, among others, Defendants have retaliated against McNair by failing to pay her salary and ultimately, forcing McNair to accept her constructive/effective termination (reinforced by Defendants affirmatively terminating her employment) in violation of the ADAAA, after and because she engaged in protected activity.

194.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, McNair has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## FIFTH CAUSE OF ACTION
### Failure to Provide a Reasonable Accommodation in Violation of the NYSHRL
### (As to all Defendants)

195.    Plaintiff McNair repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

196.    NYSHRL § 296(3)(a) states:

> It shall be an unlawful discriminatory practice for an employer…to refuse to provide reasonable accommodations to the known disabilities…of an employee…in connection with a job or occupation sought or held […].

197.    By the actions described above, among others, Defendants violated the NYSHRL's obligation to provide a reasonable accommodation for McNair's disability by, after learning of

McNair's carpal tunnel syndrome, repeatedly refusing to provide her a voice-to-text program, scribe service, or other reasonable accommodation allowing McNair to return to work with only limited typing.

198.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, McNair has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## SIXTH CAUSE OF ACTION
### Discrimination in Violation of the NYSHRL
### (As to all Defendants)

199.    Plaintiff McNair repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

200.    By the actions described above, among others, Defendants have discriminated against McNair as a result of her disability—carpal tunnel syndrome—in violation of the NYSHRL.

201.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, McNair has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## SEVENTH CAUSE OF ACTION
### Hostile Work Environment in Violation of the NYSHRL
### (As to all Defendants)

202.    Plaintiff McNair repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

203.    Executive Law § 296 provides for a hostile work environment claim where an employee shows that she was subjected to, "inferior terms, conditions or privileges of employment because of [her] membership in one or more . . . protected categories.".

204.     By the actions described above, among others, Defendants have subjected McNair to a discriminatory hostile work environment as a result of her disability—carpal tunnel syndrome—in violation of the NYSHRL.

205.     As a direct and proximate result of Defendants' unlawful discriminatory conduct, McNair has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## EIGHTH CAUSE OF ACTION
### Retaliation in Violation of the NYSHRL
### (As to all Defendants)

206.     Plaintiff McNair repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

207.     By the actions described above, among others, Defendants have retaliated against McNair by, *inter alia*, by failing to pay her salary and ultimately, forcing McNair to accept her constructive/effective termination (reinforced by Defendants affirmatively terminating her employment) in violation of the NYSHRL, after and because she engaged in protected activity.

208.     As a direct and proximate result of Defendants' unlawful discriminatory conduct, McNair has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## NINTH CAUSE OF ACTION
### Failure to Provide a Reasonable Accommodation in Violation of the NYCHRL
### (As to all Defendants)

209.     Plaintiff McNair repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

210.     NYCHRL § 8-107(15)(a) states:

> …it is an unlawful discriminatory practice for any person prohibited by the provisions of this section from discriminating on the basis of disability not to

provide a reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity.

211.    By the actions described above, among others, Defendants violated the NYCHRL's obligation to provide a reasonable accommodation for McNair's disability by, after learning of McNair's carpal tunnel syndrome, repeatedly refusing to provide her a voice-to-text program, scribe service, or other reasonable accommodation allowing McNair to return to work with only limited typing.

212.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, McNair has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**TENTH CAUSE OF ACTION**
**Discrimination in Violation of the NYCHRL**
**(As to all Defendants)**

213.    Plaintiff McNair repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

214.    By the actions described above, among others, Defendants have discriminated against McNair as a result of her disability—carpal tunnel syndrome—in violation of the NYCHRL.

215.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, McNair has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**ELEVENTH CAUSE OF ACTION**
**Hostile Work Environment in Violation of the NYCHRL**
**(As to all Defendants)**

216.    Plaintiff McNair repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

217.    Pursuant to the New York City Administrative Code, an employee can establish a hostile work environment claim if she can show that she was treated less well than other employees because of her protected class.

218.    McNair was treated less well by the Defendants because of her disability—carpal tunnel syndrome.

219.    By the actions described above, among others, Defendants subjected McNair to a hostile work environment on the basis of her disability—carpal tunnel syndrome—in violation of the NYCHRL.

220.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, McNair has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**TWELFTH CAUSE OF ACTION**
**Retaliation in Violation of the NYCHRL**
**(As to all Defendants)**

221.    Plaintiff McNair repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

222.    Pursuant to the New York City Administrative Code, it is an unlawful discriminatory practice for any person to retaliate or discriminate in any manner against any person because such person has opposed the discriminatory practices.

223.    By the actions described above, among others, Defendants have retaliated against McNair by, *inter alia*, by failing to pay her salary and ultimately, forcing McNair to accept her

constructive/effective termination (reinforced by Defendants affirmatively terminating her employment) in violation of the NYCHRL, after and because she engaged in protected activity.

224.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, McNair has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A. Issuing a declaratory judgment that the practices complained of herein are unlawful under applicable federal, state, and municipal law;

B. Declaring that Defendants' violated the ADAAA, NYSHRL, and NYCHRL by failing to accommodate Plaintiff, discriminating against Plaintiff, subjecting Plaintiff to a hostile work environment, and retaliating against Plaintiff after and because she complained of or opposed Defendants' discriminatory conduct, and awarding a recovery for damages sustained;

C. Directing Defendants to place Plaintiff in the in the position she would have occupied but for Defendants' discriminatory and otherwise unlawful conduct and making Plaintiff whole for all earnings and other benefits she would have received but for Defendants' discriminatory and unlawful treatment, including, but not limited to, title, seniority status, wages and other lost benefits;

D. Awarding Plaintiff compensatory monetary and/or economic damages, including but not limited to the loss of past and future income, wages, compensation, and other benefits of employment, incurred as of result of Defendants' violations of the ADAAA, NYSHRL, and NYCHRL, in an amount to be determined at trial, plus prejudgment interest;

E. Awarding Plaintiff compensatory non-monetary and/or non-economic damages, including but not limited to compensation for mental anguish, humiliation, embarrassment, reputational harm, stress and anxiety, emotional and psychological pain and suffering, emotional and psychological distress and the physical manifestations caused, incurred as a result of Defendants' violations of the ADAAA, NYSHRL, and NYCHRL, in an amount to be determined at trial, plus prejudgment interest;

F. Awarding Plaintiff punitive damages for Defendants' violations of the ADAAA, NYSHRL, and NYCHRL, in an amount to be determined at trial, plus pre-judgment interest;

G. Awarding Plaintiff prejudgment and post-judgement interest, retroactive to the date the damages accrued, under the ADAAA, NYSHRL, and NYCHRL;

H. Awarding Plaintiff reasonable attorney's fees, costs, and expenses of the action under the ADAAA, NYSHRL, and NYCHRL;

I. Awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated: August 5, 2022
New York, New York

Respectfully submitted,

**Akin Law Group PLLC**

*/s/ Justin Ames*

_____

Justin Ames

45 Broadway, Suite 1420
New York, NY 10006
Telephone:  (212) 825-1400
Facsimile:   (212) 825-1440
justin@akinlaws.com

*Counsel for Plaintiff*